## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| Terri Lynn Mellon, | ) | |
| | ) | **ORDER DENYING DEFENDANT'S** |
| Plaintiff, | ) | **MOTION FOR SUMMARY JUDGMENT** |
| | ) | **AND GRANTING PLAINTIFF'S** |
| | ) | **MOTION FOR SUMMARY JUDGMENT** |
| vs. | ) | **TO THE EXTENT THAT IT REQUESTS** |
| | ) | **REMAND** |
| Nancy A. Berryhill, Acting Social Security | ) | |
| Administration Commissioner, | ) | Case No. 1:18-cv-00071 |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff Terri Mellon seeks judicial review of the Social Security Commissioner's decision to discontinue her benefits under the Social Security Act, 42 U.S.C. §§ 401-434. This court reviews the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## I.     BACKGROUND

### A.     Procedural History

In October 2013, the Social Security Administration ("SSA") found that Mellon was disabled due to breast cancer with an onset date of April 12, 2013. (Doc. No. 11-3 at 2).  The SSA later reviewed her file and found that her disability had ceased as of February 1, 2015. Id. at 14. Mellon's requests for reconsideration were denied, and she requested a hearing in front of an administrative law judge. This hearing was held on December 5, 2016. Mellon was unrepresented. (Doc. No. 11-3 at 15-16, Doc. No. 11-2 at 22).

On March 23, 2017, the ALJ issued a hearing decision confirming the denial of Mellon's request for continued benefits. Id. On February 6, 2018, the Appeals Council of the SSA denied Mellon's request for review. Id. at 2. This action followed.

Mellon filed a Motion for Summary Judgment in the instant case on August 20, 2018. (Doc. No. 13). The SSA filed a Motion for Summary Judgment on September 18, 2018. (Doc. No. 15). Mellon filed her response on October 5, 2018. (Doc. No. 17).

**B.**     **Personal History**

Mellon was born in 1968. (Doc. No. 11-2 at 47). At the time of the hearing, she lived alone. Id. She has a bachelor's degree in graphic design and an associate's degree in commercial art. Id.

Mellon worked as a graphic designer from 1989 until April 2013 for various companies. (Doc. No. 11-2 at 50-53). Her most recent job was at a business called KK Bold; she was fired in April 2013. Id. at 53.

**C.**     **Medical History**

Mellon's October 2013 disability finding was based on a primary diagnosis of breast cancer. (Doc. No. 11-3 at 2). Mellon's breast cancer was diagnosed and treated via multiple surgeries and rounds of chemotherapy in 2010 and 2011. (See generally, Doc. Nos. 10-16). She has taken the medication anastrozole (brand name Arimidex) since approximately 2011 to reduce the risk of cancer recurrence. (Doc. No. 11-24 at 12-13).

Mellon's breast cancer met the criteria for Listing 13.10A when she first applied in 2013, automatically justifying a finding of disability. (See Doc. No. 11-3 at 3-13). Other severe impairments noted by the SSA in 2013 included affective disorder, organic brain syndrome, and anxiety disorder. These impairments did not meet any listing criteria. Id.

The SSA later found Mellon's disability had ceased as of February 1, 2015. Numerous medical records between February 2015 and Mellon's 2016 disability hearing reflect treatment

for a variety of conditions such as lymphedema, depression, fatigue, and memory and attention difficulties. See generally Doc. Nos. 11-20, 11-21, 11-22, 11-23.

The administrative record further contains a consultation with a neuropsychologist whom Mellon visited for cognitive testing pursuant to her oncologist's recommendation. (Doc. No. 11-21). Four state agency consultants also prepared evaluations of Mellon's physical and mental condition. (Doc. Nos. 11-19, 11-21).

## II.     GOVERNING LAW

### A.     Standard of review

Upon review of the entire record, the court can affirm, modify, or reverse the decision of the Commissioner, with or without remanding the case for rehearing. 42 U.S.C. § 405(g). To affirm the Commissioner's decision, the court must find that substantial evidence appearing in the record as a whole supports the decision. See Id.; Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989). As the Eighth Circuit has repeatedly stated, the "substantial evidence on the record as a whole" standard demands more rigorous review than the "substantial evidence" standard:

> "Substantial evidence" is merely such "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." "Substantial evidence on the record as a whole," however, requires a more scrutinizing analysis. In the review of an administrative decision, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory.

Minor v. Astrue, 574 F.3d 625, 627 (8th Cir. 2009) (citing Wilson v. Sullivan, 886 F.2d 172, 175 (9th Cir. 1989)). See also Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).

The court may disturb an ALJ's decision only if the decision lies outside the available "zone of choice." Nicola v. Astrue, 480 F.3d 885, 886 (8th Cir. 2007) (citation omitted). An

ALJ's decision is not outside the "zone of choice" simply because a court might have reached a different result had it been the initial trier of fact. Id.

**B.**     **Law governing eligibility for continuing disability**

Mellon was found disabled in 2013, but her disability was found to have ended and her benefits were terminated in 2015. She appeals the decision to terminate her benefits.

A person's disability benefits may be terminated if substantial evidence demonstrates medical improvement to the person's impairment or combination of impairments and the individual is now able to engage in substantial gainful activity. See 42 U.S.C. § 423(f). The continuing disability review process requires an eight-step sequential analysis found in 20 C.F.R. § 404.1594(f). The Commissioner must determine the following:

(1) whether the claimant is currently engaging in substantial gainful activity,

(2) if not, whether the disability continues because the claimant's impairments meet or equal the severity of a listed impairment,

(3) whether there has been a medical improvement,

(4) if there has been a medical improvement, whether it is related to the claimant's ability to work,

(5) if there has been no medical improvement or if the medical improvement is not related to the claimant's ability to work, whether any exception to medical improvement applies,

(6) if there is medical improvement and it is shown to be related to the claimant's ability to work, whether all of the claimant's current impairments in combination are severe,

(7) if the current impairment or combination of impairments is severe, whether the claimant has the residual functional capacity to perform any of his past relevant work activity, and

(8) if the claimant is unable to do work performed in the past, whether the claimant can perform other work.

Delph v. Astrue, 538 F.3d 940, 945–46 (8th Cir. 2008). This eight-step analysis includes the five steps followed in an initial disability determination. Delph, 538 F.3d at 946.

## III.  ANALYSIS AND DISCUSSION

### A.  ALJ's Decision

The ALJ issued her written opinion on March 23, 2017. (Doc. No. 11-2).

The ALJ found that, through the date of the decision, Mellon had not engaged in substantial gainful activity. She next determined that the evidence established the following medically determinable impairments since February 1, 2015: history of breast cancer, cognitive/memory impairment, depressive disorder, fatigue, dysphagia, and lymphedema. Id. at 24.

The ALJ then found none of the impairments, individually or in combination, equaled the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1. She noted that Listing 13.10, breast cancer, was satisfied at the outset of Mellon's disability, but the records do not reflect cancer recurrence. The ALJ also found the listings for mental disorders were not satisfied. Id. at 24-26.

The ALJ then concluded that medical improvement occurred by February 1, because Mellon's cancer had not recurred. She determined that this improvement was related to Mellon's ability to work. Id. at 26.

Lastly, the ALJ found that Mellon's impairments present since February 1, 2015 did not cause more than a minimal impact on her ability to perform basic work activities, and as such, Mellon no longer had a severe impairment or combination of impairments. In making this

finding, the ALJ underwent a two-step process which resulted in two specific conclusions. First, she determined that Mellon's medically determinable impairments could be expected to produce her alleged symptoms. But then, she found Mellon's statements regarding her symptoms and their intensity, persistence, and limiting effects were "not entirely consistent with the objective medical and other evidence." Id. at 26-27.

Because the ALJ concluded none of Mellon's impairments were severe, she found Mellon not disabled at step six and ended the analysis. She did not complete the last two steps, which would have included determining Mellon's residual functional capacity and deciding whether she has the RFC to perform any of her past work or other work.

B.      Mellon's Arguments

In her brief, Mellon argues the ALJ's decision to classify her impairments as non-severe was erroneous. Specifically, Mellon claims that 1) her memory and concentration limitations are a severe impairment; 2) her lymphedema is a severe impairment; and 3) her conditions when considered together constitute a severe impairment.

The Eighth Circuit has dictated that if an impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two. Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007). Here, the severity analysis occurs at step seven, but the severity standard is the same as that in an initial disability case. See, e.g., Delph, 538 F.3d at 946 ("This eight-step analysis includes the five steps followed in an initial disability determination").

Severity is not an "onerous requirement," but nor is it a "toothless standard." Kirby, 500 F.3d at 708. The sequential evaluation process may be terminated at step two only when the

claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work. <u>Caviness v. Massanari</u>, 250 F.3d 603, 605 (8th Cir. 2001). In other words:

> Great care should be exercised in applying the not severe impairment concept. If an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation process should not end with the not severe evaluation step. Rather, it should be continued.

<u>Gilbert v. Apfel</u>, 175 F.3d 602, 604 (8th Cir. 1999) (quoting Social Security Ruling 85-28).

The court will examine each impairment in turn to determine whether the ALJ's determination of non-severity was supported by substantial evidence.

### 1. Mellon's Memory and Concentration Limitations

The ALJ found that Ms. Mellon had a medically determinable impairment of cognitive/memory impairment, but the impairment was non-severe. The Court will summarize the record regarding Ms. Mellon's alleged cognitive and memory problems before turning to the legal arguments.

Mellon alleged cognitive and memory problems in her initial application for Social Security benefits. In July of 2013, pursuant to her initial Social Security application, Mellon was sent to Dr. Edward Kehrwald for a consultative exam regarding cognitive problems. (Doc. No. 11-17 at 21). In his report, he wrote Mellon "had many features associated with classical chemotherapy-related cognitive dysfunction, perhaps compounded by menopausal status and hormone therapy." <u>Id.</u> at 26. Most of her mental status function was fairly even and in the average range, except for concentration and short-term recall; her memory testing results suggested some relative weaknesses. <u>Id.</u>

In May of 2013, Mellon consulted Dr. Brooks for a neuropsychological evaluation at the recommendation of her oncologist. (Doc. No. 11-17 at 5). Dr. Brooks found that she had normal psychological functioning overall, although a few tests showed "low average" results. Id. at 12.

In a Function Report dated January 12, 2015, just before her disability was terminated, Mellon wrote her cognitive problems and memory issues made her confused and forgetful, making it hard to communicate. (Doc. No. 11-7 at 70). She described this as post-chemo cognitive impairment or "chemo brain." Id. She stated that she has a hard time concentrating, remembering, and following instructions. Id. at 77.

At hearing in December 2016, Mellon testified she lost her job in 2013 due to her inability to concentrate and complete tasks despite "trying her hardest." Id. at 53. She explained, "I would do the job fine. It was the task of doing – getting it to the right printer or the right person of proof and I would get – I would be looking at my computer screen and just – I'd get lost and I couldn't remember where I was." Id. at 54. Her problems included losing track of specific processes, sending the wrong information to vendors, and repeating information. Id. at 54-55. However, she testified she could do the creative part of the job well. Id.

The CEO of KK Bold filled out a Work Activity Questionnaire in May 2013. (Doc. No. 11-6 at 12). He stated that Mellon was unable to complete her job duties without special assistance, and she needed extra help and lower quality standards. (Doc. No. 11-6 at 12). The questionnaire rated her productivity at 70% of other employees and noted she was frequently absent from work, and her work was unsatisfactory. Id. at 13-14.

Mellon testified that her cognitive condition had not improved since her firing in 2013. Id. at 56. She cited daily problems with short-term memory and concentration such as forgetting

what people said, problems reading books, and stopping to rewind movies every time she watches one because of an inability to follow along. Id. at 57-59. She attributed her psychological problems to one of the medications she continues to take after completing cancer treatment. Id. at 66.

Mellon's father filled out a Third Party Function Report on January 12, 2015. He writes that Mellon "has a hard time keeping her focus and attention to casual things – loses her concentration in conversation on what she was asking." (Doc. No. 11-7 at 60).

On February 3, 2015, pursuant to the instant case, Mellon presented to Dr. Christine Kuchler for a psychological evaluation. (Doc. No. 11-19 at 31). Dr. Kuchler performed a record review, clinical interview, and several tests. Id. After performing testing, Dr. Kuchler concludes that Mellon's memory functioning falls within the upper average range. Id. at 35. She briefly addresses the discrepancy between Mellon's self-reported memory problems and her test results, postulating that perhaps Mellon's memory abilities are not as high as they were in the past and thus seem deficient to her even though they are objectively normal. Dr. Kuchler also theorizes "what may seem to be memory problems to her may instead be issues of inconsistent attention and/or concentration associated with mild depression; so that when her attention is sustained, as in the current testing situation, there are no apparent issues with her memory." Id. Dr. Kuchler ultimately diagnoses Mellon with mild depressive disorder. Id.

On February 25, 2015, Dr. Harold Hase signed a Psychiatric Review Technique declaring Mellon's psychiatric impairment – unspecified mild depressive disorder – was not a severe impairment. (Doc. No. 11-19 at 36, 39). He found she had mild difficulties in maintaining concentration, persistence, or pace, but noted no other functional limitations. Id. at 11. He cites

Dr. Kuchler's report, noting her cognitive testing scores were average but her mild depression may be associated with inconsistent attention and concentration.

On April 10, 2015, Dr. Roger Larson completed a psychiatric review and concluded Mellon's psychiatric impairments were not severe. (Doc. No. 11-21 at 1). He noted her neuropsychological testing results were average, and that she prepares her own meals, cares for herself, does light housework, shops, drives, and socializes. Id. at 23. He notes a diagnosis of unspecified depressive disorder.

On May 4, 2015, Mellon completed a six-hour neuropsychological evaluation by Dr. David Brooks. (Doc. No. 11-21 at 28). Dr. Brooks administered tests of verbal fluency, memory, and problem-solving to determine Mellon's intellectual abilities. A few of Mellon's test results fell into the low average range, such as her performance on the Attention/Concentration Index Wide Range Assessment of Memory and Learning 2. Analyzing this result, Dr. Brooks noted "generally, Terri will perform rote memory tasks at a less efficient level to that of her age group. Performances at the level suggest the importance of considering such work style factors as distractibility, impulsivity, and other issues with executive abilities." Id. at 31.

However, on the vast majority of the numerous tests administered by Dr. Brooks, Mellon performed within the average or high average range. See generally, Doc. No. 11-21 at 36-39. Overall, he assessed Ms. Mellon's neuropsychological performance as normal, with normal memory and attention functioning. Id. at 39.

On May 5, 2015, Mellon complained of memory impairment and cognitive deficits to her oncology clinical team. An MRI was ordered pursuant to these complaints and reports of headaches, but the results were normal. (Doc. No. 11-21 at 46.)

On July 2, 2015, Mellon visited her primary care doctor, Dr. Jondahl, for a re-check of depression. She also cited her short-term memory and concentration issues. (Doc. No. 11-22 at 16). He stated her depressive disorder was "fairly well controlled on current medication" and wrote "I spent quite a bit of time encouraging her to try to go out and do something, but she was very refractory to this." Id. at 18.

On September 14, 2016, Mellon returned to Dr. Johndahl with a chief complaint of fatigue. Id. at 11-22. She also stated that she had memory issues and trouble swallowing. Id. Her physical exam results were normal. Dr. Johndahl assessed fatigue, memory difficulties secondary to chemotherapy, and trouble swallowing. He stated, "I doubt that her memory will ever improve." Id. at 9.

In her opinion, the ALJ determined Mellon did not have a severe mental impairment or combination of mental impairments. Id. at 28. She first cites to her earlier findings regarding the four Paragraph B criteria. Regarding the first functional area of "understanding, remembering, or applying information," the ALJ found Mellon had no limitation. Id. at 25. She cites the evaluations of Dr. Brooks and Dr. Kuchler in support. The ALJ wrote wrote, "while the claimant reports subjective difficulties in this area, objectively, her memory was assessed as intact." Id.

Regarding the second functional area of interacting with others, the ALJ found Mellon has "mild" limitation, balancing evidence such as her social relationships with her prescription for Xanax. Id. Considering the third functional area of concentrating, persisting, or maintaining pace, the ALJ referenced Dr. Brooks's finding of a slight impairment in the ability to concentrate for several minutes, but tests of attention indicated performance in the average and high average range. "However, Dr. Kuchler suggested that the claimant's perceived memory problems could

be the product of inconsistent attention or concentration (Exhibit 14F). This warrants a conclusion that the claimant is mildly limited in this area." Id. at 25. Regarding the fourth functional area of adapting or managing oneself, the ALJ found Mellon has mild limitations because of her hesitation to set goals due to her medical history. Id.

The ALJ also considered evidence of Mellon's daily activities, such as adhering to a schedule, carrying out multi-step tasks like using a computer, paying bills, and driving, and taking her father's employees' lunch orders and bringing them food. She writes, "These daily activities reflect a greater degree of physical and cognitive ability than alleged." Id. at 30. Regarding Mellon's father's third-party function report, the ALJ states, "Mr. Mellon's observations regarding the claimant's daily activities are accepted, but his observations regarding cognitive difficulties are not consistent with the record." Id. at 31. She also cites the state agency psychiatric review techniques of Dr. Larson and Dr. Hase who opined the claimant had no severe mental impairments. Id.

Mellon disputes these determinations, noting Dr. Brooks's observation that Mellon's scores fell into the "low average" and "mildly impaired" ranges, respectively, on two different tests. The Commissioner responds by citing the variety of test results showing Mellon's cognitive function was average, as well as the opinions of state agency reviewing physicians concluding that Mellon was not severely impaired. The Commissioner also cites Mellon's ability to perform daily activities.

The court first notes that Mellon's complaints over the years regarding her memory and attention difficulties have stayed remarkably consistent. The older evidence strongly implies at least some cognitive impairment during this time period. For instance, in 2013, the state

examining psychologist concluded she exhibited many symptoms associated with "classical chemotherapy-related cognitive dysfunction"; that same year, she was fired from her job and her employer detailed at length her inability to work at the level of other employees. See Doc. No. 11-21, 11-6.

However, these events occurred before the period at issue. As the ALJ points out, the overwhelming majority of her cognitive tests since February 1, 2015, have showed average or high average functioning. Dr. Brooks in particular performed extensive testing in May 2015, and a glance at his extremely detailed 12-page report supports the ALJ's conclusions. He ultimately provided results for approximately 60 tests and sub-tests, and only five of these fell below the "average" range. Of these, three results were "low average," and two were "mildly impaired."

Mellon argues that the ALJ "ignored contradictory evidence," but this overstates the case. The ALJ explicitly acknowledged Mellon's slight impairments in her opinion. (See Doc. No. 11-22 at 25, "During her neuropsychological consultation, the claimant demonstrated slight impairment in the ability to concentrate for several minutes.") The ALJ did not ignore evidence, but simply chose to follow the overwhelming majority of the cognitive results which showed normal functioning. Mellon's complaints of cognitive impairment appear sincere. But in light of this objective medical evidence, the ALJ's conclusion falls within the applicable "zone of choice." Her determination that Mellon's cognitive impairments are not severe is supported by substantial evidence on the record as a whole.

## 2.    Mellon's Lymphedema

Mellon's lymphedema is another impairment which the ALJ found to be non-severe. This court will first summarize the record with regards to this particular condition.

Mellon alleges significant limitations stemming from this condition in her right hand and arm. In her Function Report dated January 1, 2015, before her benefits were terminated, Mellon stated her lymphedema causes swelling and pain in her right arm. (Doc. No. 11-7 at 75). She wrote her right arm was "terribly affected" and her ability to lift and reach was impacted. (Doc. No. 11-7 at 75).

Mellon testified at hearing that lymphedema was one of the physical conditions limiting her work. (Doc. No. 11-2 at 59). She explained how her lymphedema affected her computer use: "I am right handed so I'm used to using a mouse for everything I did. That's very – I don't know what the word is. It's not a comfortable feeling and I've tried to do left hand – excuse me – and that's nearly impossible." Id. at 61-62.

Mellon testified her right arm was weaker than her left arm. Id. at 61. When the ALJ asked how often she could lift a gallon of milk with her right arm, Mellon answered "none." Id. She stated that if she does too much activity, the lymphedema "gets bad" and causes fluid to be retained in her fingers and hands and makes it hard to do things. Id. at 62. Mellon testified she had daily lymphedema flares. Id.

Mellon also stated that she has problems with her right arm when cleaning her condo because she becomes "worn out really easily" when doing activities such as pushing a vacuum, wiping surfaces, or putting dishes away. Id. at 69. She estimated she could clean "maybe 15, 20 minutes" before having to stop. Mellon stated she could not do any outdoor work like mowing or snow removal, which caused her to move into a condo rather than a house, where she lived previously. Id.

Mellon treats the lymphedema with a "Flexi-Touch" pneumatic pump system, consisting

of four parts that wrap around her hips, trunk, chest, and arm. Id. at 59. Mellon explained the pump runs for 62 minutes each day and she must lie down to use it. Id. at 58-59.  When the ALJ asked whether she wore anything to treat the lymphedema, Mellon responded she has a compression sleeve that she uses when she flies, but daily use of the pump keeps the condition "at a point" and "does a really good job." Id. at 62.

According to the medical records, Mellon has sought treatment several times since February 1, 2015, for lymphedema. On February 4, 2015, Mellon consulted an occupational therapist. (Doc. No. 11-20 at 41-45). The "history of present illness" section states "Duration: last 3-4 weeks started bothering again," and under notes, reads "2011 HPC 4 weeks of full therapy. Had compression sleeve and gauntlet glove. Stopped wearing during the summer as was too hot and uncomfortable." Id. at 43. The therapist noted moderate edema in Mellon's trunk, axillary, and throughout her right upper extremity. She also described the edema as mild. Id. at 43-44. She recommended complete decongestive therapy, including manual lymphatic drainage and compression layered bandaging.

On February 23, 2015, Mellon returned to for follow-up care. The therapist noted continued edema in her trunk, axillary, and right upper extremity. Id. at 41. She treated Mellon with a pneumatic pump, compression bandages, and manual therapy.  Id. at 40-41.

Mellon returned for an hour of similar treatment approximately ten more times over the next few weeks, through March 11. Id. at 11-40. At that point, the therapist observed Mellon's edema had decreased by 3% since the most recent visit, although it was still measured as moderate, and that Mellon was working with a vendor to be measured for a compression sleeve and home edema pump. She also noted Mellon was compliant with a home treatment program

for the edema. Id. at 14.

On March 16, Mellon returned to the clinic to receive paperwork for her edema sleeve in preparation for a flight. Dr. Johndahl, her primary care physician, noted "she has been treating lymphedema of her right arm since her mastectomy, on and off. It's been more of a problem in the last month…" He noted that there was no edema present in her right arm that day. Id. 9-10.

On a medical consultation dated April 8, 2015, Dr. Thomas Christianson performed a Physical Residual Functional Capacity Assessment related to the primary diagnosis of Mellon's lymphedema. He concluded Mellon's impairments established no exertional, postural, manipulative, visual, communicative, or environmental limitations. (Doc. No. 11-21, 3-10). He cites approximately seven medical records from the period of 2012 to 2015, summarizing them briefly. His report does not include a great deal of analysis, but he concludes Mellon's allegations of symptoms "appear to be overstated," as her memory testing showed normal cognitive capacity, she participates in a bowling team, drives, and prepares her own meals. Id. at 8.

On July 2, 2015, Mellon visited Dr. Johndahl, her primary care physician. (Doc. No. 11-22 at 16). He noted she was using the Flexi-Touch pump system for her right arm lymphedema, and it was going well.

On March 17, 2016, Mellon visited Dr. Johndahl with a chief complaint of right-hand soreness and swelling for the past three days. (Doc. No. 11-22 at 13). The doctor noted she had not done home lymphedema treatments in several days because of the pain, and the pain had woken her from sleep. Id. He wrote she had mild swelling in the right thumb, full range of motion, and good strength. Id. After ordering and reviewing an X-ray which was negative for

fractures, Dr. Johndahl concluded Mellon "likely has a bit of nerve compression due to her right arm lymphedema." Id. at 15. He recommended treating with NSAIDs, compression and elevation.

In May of 2015, after the initial decision to terminate Mellon's disability but before her hearing with the ALJ, Mellon had a disability hearing with a disability hearing officer. (Doc. No. 11-4 at 15). This officer found that Mellon's lymphedema was a severe impairment. Id. at 40. The hearing officer ultimately concluded that Mellon was not disabled because despite her limitations, there was available work in the economy which she could perform. Id. at 42.

The ALJ found Mellon's lymphedema was a medically determinable impairment, but determined it was not severe. Her main analysis was:

> The claimant has treated for lymphedema since completing cancer treatment. The claimant's lymphedema has been documented via occupational therapy consultations and measurements (Exhibit 17F, pp. 22-43). However, upon clinical examination, edema is not routinely noted (Exhibit 27F). Moreover, the claimant's sensory and motor functioning across both hands was "high average" as assessed in the neuropsychological examination (Exhibit 20F, p. 14).

(Doc. No. 11-2 at 28).

Mellon argues her edema is indeed severe. She alleges that the ALJ failed to properly consider her testimony regarding the limiting effects of her edema, e.g., her difficulties with repetitive motion, lifting and carrying. She points out that lifting and carrying is a very different ability than the fingering tested by Dr. Brooks. She claims these symptoms significantly impact her ability to work. Mellon further avers the ALJ failed to properly consider her need to lie down and use the edema pump for an hour each day and argues this would be intolerable in any competitive employment.

In response, the Commissioner points to various examination notes in the medical record that made no findings of lymphedema, and reflected normal range of motion, strength, and movement. The Commissioner also cites Mellon's hearing testimony that the Flexi-Touch pumping system is effective, and cites case law for the proposition that impairments which are controlled by treatment are not disabling.

It is true that many of Mellon's providers did not note lymphedema or right arm dysfunction upon physical examinations occurring during the relevant time period. The ALJ specifically cites exhibit 27F, which in the current file is found at Doc. No. 11-23, pages 2-90. In these records, from an emergency room visit as well as four oncology visits between September 2015 and April 2016 note "no edema" during physical examination and lack any reference to any arm pain or swelling. (See Doc. 11-23 p. 5, 27, 33, 39, 44). Several more gastroenterology visit notes during the same time frame note "no pedal edema," or foot edema. See, e.g., Id. at 53.

On the other hand, as noted at least four times by Mellon's primary care physician and therapist, Mellon had been treating her lymphedema at home starting in February 2015. See Doc. No. 11-20 at 14, 9-10, 13, 16. And at hearing, Mellon testified she uses the Flexi-Touch pumping system for an hour a day and avoids using the arm to reduce her lymphedema. (Doc. No. 11-2 at 59-61). Her testimony provides a logically sound explanation for the lack of references to edema in certain medical records that still allow for its severity: namely, Mellon treats her lymphedema at home and limits her activity to avoid exacerbating it. The lack of medical records alone does not constitute substantial evidence that Mellon's lymphedema is non-severe when viewed within the context of the record as a whole.

The lack of medical records was not the only reason the ALJ found Mellon's

lymphedema non-severe. Her opinion also stated, "Moreover, the claimant's sensory and motor functioning across both hands was 'high average' as assessed in the neuropsychological examination." However, upon closer inspection, this examination does not seem to be particularly persuasive.

As discussed at length above, Mellon completed a six-hour neuropsychological evaluation with Dr. David Brooks. (Doc. No. 11-21, p. 28). As Dr. Brooks explains, Mellon was referred by her oncologist because of challenges with memory. Id. His ultimate conclusions were that her memory and attention functioning were normal. Id. at 39. To reach this result, Dr. Brooks administered many tests, including tests of verbal fluency, memory, problem-solving, etc. He ultimately provides scores for upwards of 60 different evaluations and sub-evaluations. Id. at 36-39. Only four of these, however, address Mellon's sensory and motor functions: a "finger tapping" test and a "grooved pegboard" test, both given once for each hand. Id. at 38.

It is apparent from the face of his evaluation that Dr. Brooks did not intend it to be an exhaustive analysis of the function of Mellon's upper right extremity. He had been primarily concerned with her memory and attention. While the undersigned has no reason to doubt his expertise in his field, Dr. Brooks is not an M.D., but rather holds a Ph.D. in clinical neuropsychology. The ALJ's citation to these narrow test results is not substantial evidence on the record as a whole when viewed in light of Mellon's much broader complaints of right-hand pain and dysfunction.

The ALJ also cites Mellon's extensive daily activities, such as independent living in a condominium, preparation of simple meals and independence in housekeeping, etc. (Doc. No. 11-2 at 30). She "is physically able to lift and carry groceries, cleaning products, and the like.

She is able to use her hands to use the computer, drive a car, or use cooking implements and hand tools." Id.  However, Mellon specifically testified she is limited in most of these areas because of her lymphedema: she struggles to clean her condo because of her right arm, has difficulty using a computer mouse with her right hand, limits her cooking, lives in a condo instead of a house to minimize upkeep, and tends to use her left hand when lifting groceries. (Doc. No. 11-2 at 59-62, 69).

The ALJ also points to Mellon's testimony regarding the use of her Flexi-Touch pump system and its effectiveness as evidence her lymphedema is non-severe. The Commissioner cites Brown v. Astrue for the rule that impairments that can be controlled by treatment or medication are not disabling. 611 F.3d 941, 955 (8th Cir. 2010). But in Brown, the claimant's impairments are controlled by medication, not a pumping system requiring an hour to use every day while lying down. 611 F.3d at 955. Furthermore, in Brown, the ALJ *did* find the claimant had severe impairments but went on to find these impairments did not reduce her residual functional capacity to the extent she could not work. Id. at 951. These findings are inapposite to the present case, where the ALJ did *not* find Mellon's impairments severe and never reached the question of functional capacity to work. The court finds persuasive Mellon's arguments that the use of this pumping system could interfere with her ability to work, but the ALJ did not discuss or even mention this possibility.

Lastly, the ALJ mentions the opinions of state agency consultants Ralph Kilzer, M.D., and Thomas Christianson, M.D., stating that these opinions are given great weight. Dr. Christianson's evaluation specifically addresses Mellon's lymphedema. See Doc. No. 11-21, 3-10.

It appears that Dr. Christianson did not examine Mellon personally. As such, he is a non-examining source. Various Eighth Circuit cases discuss the weight to be given non-examining sources.

> Opinions of nonexamining medical sources are generally given less weight than those of examining sources." *Wildman v. Astrue,* 596 F.3d 959, 967 (8th Cir.2010) (ellipsis omitted). "That is especially true when, like here, the nonexamining expert's opinion is given in checklist format." *McCoy v. Astrue,* 648 F.3d 605, 615 (8th Cir.2011) (noting that "checklist format, generality, and incompleteness of the assessments limit the assessments' evidentiary value" (brackets omitted)).

Papesh v. Colvin, 786 F.3d 1126, 1133 (8th Cir. 2015). Furthermore, the opinion of a non-examining consulting physician is given less weight if that physician did not have access to relevant medical records, including those generated after the evaluation occurred. McCoy v. Astrue, 648 F.3d 605, 616 (8th Cir. 2011).

There are several aspects of Dr. Christianson's assessment which call into doubt the ALJ's decision to give it great weight. It is given in checklist format, and his analysis is cursory, consisting of brief summaries of medical records and spanning about half a page overall. For instance, he summarizes Mellon's February 23, 2015 visit to an occupational therapist for lymphedema treatment by saying "Claimant have lymphedema issues in her R arm. Sensation intact, shws has normal ROM of her right arm and L arem [sic]." But he does not mention the hour of therapy she received that day, the measurements taken of her arm, or any details of the course of her disease, such as the other 10 visits she made to the therapist that month. Furthermore, his assessment took place in April 2015, over a year and a half before the hearing. Thus he had no opportunity to evaluate Mellon's 2016 report of lymphedema-related pain. For all of these reasons, the court disagrees with the ALJ's decision to give his analysis great weight.

Overall, the court finds multiple weaknesses in the ALJ's rationale for finding Mellon's lymphedema non-severe. Keeping in mind the Eighth Circuit's caution that "great care" must accompany a decision to find an impairment non-severe, this court cannot conclude that substantial evidence on the record as a whole shows Mellon's lymphedema had no more than a minimal impact on her ability to work. It is entirely possible that Mellon is not disabled; this court makes no findings regarding the ultimate issue. But the ALJ did not even reach the issue of Mellon's residual functional capacity and resulting employability, and her decision to terminate the analysis is not supported by substantial evidence.

In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings. Buckner v. Apfel, 213 F.3d 1006, 1011 (8th Cir. 2000). Two types of remand are possible under Section 405(g), which governs judicial review of the Commissioner's decisions: sentence four remand and sentence six remand. Buckner, 213 F.3d at 1010. Sentence four remands are proper when a district court makes a substantive ruling regarding the correctness of a decision of the Commissioner and remands the case accordingly. Id. A sentence four remand is appropriate in Mellon's case.

As such, this Court remands Mellon's case so the Social Security Administration may make further findings on Mellon's lymphedema and its severity. If Mellon's lymphedema is found to be severe, then the ALJ must continue the analysis and determine Mellon's residual functional capacity by considering *all* her impairments, severe and non-severe alike. See 20 C.F.R. § 404.1545(a)(2).

### 3. Mellon's Impairments as a Whole

In her last point, Mellon cites her conditions of hip pain, chest pain, mental impairments, depression, fatigue, dysphagia, and lymphedema, and argues that these conditions in combination with one another constitute a severe impairment.

The ALJ found Mellon had the medically determinable impairments of: history of breast cancer, cognitive/memory impairment, depressive disorder, fatigue, dysphagia, and lymphedema, but none of these were severe. She stated that since February 1, 2015, Mellon no longer had "a severe impairment or *combination of impairments*." (Doc. No. 11-2 at 26).

Mellon criticizes the ALJ's failure to discuss her hip pain and chest pain, arguing the ALJ was required to look at the claimant as a "whole person" and failed to do so. Mellon concludes that these impairments, in combination with each other and with her mental impairments, depression, fatigue, dysphagia, and lymphedema, constitute severe impairments which limit her ability to perform work. The Commissioner responds simply that the medical record and Mellon's daily activities support the ALJ's conclusion.

Mellon previously argued both her memory problems and lymphedema are severe when considered individually. This argument differs: Mellon does not allege, for example, that her fatigue or hip pain are themselves severe. Rather, she alleges her impairments "as a whole" reach the level of severity, i.e., cause more than a minimal effect on her ability to work.

The law regarding combined impairments is explained in the Code of Federal Regulations:

> (c) Combined effect. In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all

of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, we will consider the combined impact of the impairments throughout the disability determination process. If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled (see § 404.1520).

20 C.F.R § 404.1523(c)

As stated above, the non-severity of Mellon's lymphedema is not based upon substantial evidence. It logically follows that the non-severity of her lymphedema *plus* her other impairments is not based upon substantial evidence. Upon remand, the ALJ should revisit not only the lymphedema as directed above, but consider whether Mellon's other impairments in combination with the lymphedema caused more than a minimal impact on her ability to work.

Furthermore, if the ALJ re-examines the evidence and finds even a single severe impairment or combination of impairments, any non-severe impairments must still be taken into account when determining Mellon's residual functional capacity:

(2) If you have more than one impairment. We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not "severe," as explained in §§ 404.1520(c), 404.1521, and 404.1523, when we assess your residual functional capacity. (See paragraph (e) of this section.)

20 C.F.R. § 404.1545

But the analysis does not end here because in her third argument, Mellon alleges an impairment – hip pain – which the ALJ does not find to be medically determinable at all[1]. A review of the record is necessary to evaluate this conclusion.

---

[1] Mellon also cites chest pain as an impairment. The ALJ did not use this term, but it is clear that most of Mellon's chest pain complaints result from the aftereffects of her mastectomy, and the ALJ did identify "history of breast cancer" as an impairment.

Mellon sought treatment multiple times for right hip pain back in the spring of 2012. Her doctors acknowledged the possibility that Arimidex was causing her hip pain and eventually directed her to temporarily stop taking it. (e.g., Doc. No. 11-18 at 21, 25, 32). Mellon was ultimately diagnosed with a stress fracture in her right hip. (Doc. No. 11-18 at 21, 15). In June 2012, her oncologist noted improving pain in her right hip and decided to resume the Arimidex, suggesting over the counter pain medications to control her musculoskeletal symptoms. (Doc. No. 11-16 at 75). Mellon's hip pain is mentioned occasionally thereafter during this time period. (See, e.g., Doc. No. 11-16 at 70, Doc. No. 11-18 at 12).

Turning to the evidence generated after February 1, 2015,  Mellon complained of trouble with her right hip in a September 2015 visit to her oncologist. (Doc. No. 11-23 at 25). Dr. Gray ordered a PET scan to determine whether her cancer had recurred. Id. at 28. He noted she was tolerating her Arimidex "with some difficulty but manageable" in terms of joint pain and muscle pain. Id. He stated Mellon formerly had osteoporosis complicated by aromatase inhibitor (i.e., Arimidex) use, but now her condition had improved to osteopenia. He concluded that she should continue taking Prolia, a medication to protect her bones. Id.

On October 12, 2015, Mellon returned to follow up on the previously-ordered scan and stated she was feeling much better, though she still experienced hip pain and occasional chest pain. Id. at 31. Dr. Gray noted her PET scan showed no signs of cancer, and recommended she follow up with her primary care physician for hip and chest pain.

In October 12, 2016, Mellon visited her oncologist for a follow-up. He noted she was feeling "quite well" with no major problems, and she was tolerating the Arimidex "quite well."

On her Function Report dated January 12, 2015, Mellon stated that she suffered from a

weak right hip due to a fracture from medicine. (Doc. No. 11-7 at 70). She wrote her right hip affected her ability to do house and yard work. Id. at 73. She stated she had a walker, which was prescribed by a doctor in May 2012, to keep the weight off her right hip when it starts hurting. She also had a cane that she uses more than the walker. Id. at 76.

There was little testimony elicited at hearing about Mellon's hip pain. The following exchange occurred between Mellon and the ALJ:

> Q. Any side effects from those medications?
> A. You know, the Prolia shot, I don't know. I don't know if some of my hip pain could be from that. They say side effects could be. I don't know sometimes what causes what, like –
> Q. Sure. Okay. Well, it looks like we need to get some updates on your treatments. The last records we have were from May of 2015 . . .

Doc. 11-2 at 64.

Neither the ALJ nor Mellon returned to the subject of Mellon's hip pain. Mellon later mentions her treatment at the Cleveland Clinic for her hip fracture, but there is no further discussion of her injury or any of the symptoms. Id. at 63.

The ALJ did not list hip pain as a medically determinable impairment. A medically determinable impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Marolf v. Sullivan, 981 F.2d 976, 978 (8th Cir. 1992) (citing 42 U.S.C. § 423(d)(3), 20 C.F.R. § 404.1527(a)(1).

On the face of the record, there are several abnormalities supported by medical evidence that could cause Mellon's alleged hip pain. She suffered a clinically-documented stress fracture sometime in 2012 and multiple doctors identify musculoskeletal symptoms caused by Arimidex.

It is unclear why this evidence is insufficient to establish Mellon's right hip pain as a medically determinable condition. The ALJ did briefly note Mellon's improving hip pain. But she did not explicitly discuss whether it was medically determinable or give any justification for finding it was not. This court cannot conclude that the ALJ's decision is supported by substantial evidence without any insight into her rationale. Upon remand, the ALJ should make specific findings regarding Mellon's hip condition.

## IV.      CONCLUSION

Mellon's Motion for Summary Judgment (Doc. No. 13) is **GRANTED** to the extent that it requests remand, and the Social Security Administration's Motion for Summary Judgment (Doc. No. 15) is **DENIED**. Pursuant to 42 U.S.C. § 405(g), the judgment of the Commissioner is **REVERSED** and the case is **REMANDED** for proceedings consistent with this opinion.

**IT IS SO ORDERED.**

Dated this 5th day of December, 2019.

_/s/ Clare R. Hochhalter_
Clare R. Hochhalter, Magistrate Judge
United States District Court